**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**JUSTIN GUENTHER,**
**SPECIAL ADMINISTRATOR OF THE**
**ESTATE OF SEMMIE JOHN GUENTHER,**
**Deceased** **PLAINTIFF**

**v.** **CASE NO. 5:15-CV-05192**

**GRIFFIN CONSTRUCTION**
**COMPANY, INC.** **DEFENDANT**

## MEMORANDUM OPINION

### I. Background

This is a case that involves complex questions touching on the nature of federalism, the power of the federal courts, and the content of federal common law. It also involves a difficult question of state law that hinges on three Arkansas Supreme Court cases from the turn of the twentieth century. But these complex legal issues arise from relatively simple facts.

According to Plaintiff Justin Guenther, Special Administrator of the Estate of Semmie John Guenther (the "Estate"), in 2008 Semmie John Guenther ("Guenther") was hired as a construction superintendent by Griffin Construction Company, Inc. ("Griffin"). Guenther was diagnosed with prostate cancer in 2012. He requested, and was granted, a three-week leave to undergo treatment, which was apparently successful. However, in 2013, while on assignment on a project in El Dorado, Guenther learned that he had cancer throughout his body, including in his lungs and chest cavity. On July 22, 2013, he notified Griffin that he was going to have radiation therapy for about three weeks, and would be able to return to work on August 20, 2013. Later in

July, however, Griffin notified Guenther that he was terminated, and could reapply for a job after he was able to return to work if they had any openings available. He was told that he could keep his COBRA insurance for at least another month, but that assurance never came to fruition. Griffin also terminated Guenther's $100,000.00 life insurance policy.

Guenther filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 9, 2013. He then passed away on May 29, 2014. On May 15, 2015, the Estate received a "Right to Sue" letter from the EEOC, and subsequently filed the instant suit on August 12, 2015. The Complaint alleges that Griffin's termination of Guenther's employment and benefits constitutes discrimination in violation of the Americans with Disabilities Act ("ADA") and the Arkansas Civil Rights Act ("ACRA"). Griffin[1] filed its Answer on August 31, 2015, generally denying the allegations against it and raising several affirmative defenses. It then filed the instant Motion to Dismiss on October 29, 2015, the basis for which is that Guenther's ACA and ACRA claims do not survive his death. The Motion asks this Court to apply Arkansas' survival statute, Ark. Code Ann. § 16-62-101(a), either directly or indirectly as the federal rule of decision, to the Estate's ADA claim, and to the Estate's ACRA claim. It then argues that the survival statute abates both claims due to Guenther's death.

The Estate responds by first suggesting that the Court should not apply Arkansas' survival statute to its ADA claim, and instead should look to federal common

[1] The Estate originally named two entities, Griffin Construction and Griffin Properties, as defendants in its Complaint. The Griffin entities each filed separate Answers to the Complaint, and then jointly filed the Motion to Dismiss currently before the Court. However, at the parties' November 3, 2015 Case Management Hearing, the Estate agreed to dismiss Griffin Properties from the case. To avoid confusion, this section refers to Griffin Construction as the sole filer of the Answer and Motion to Dismiss.

law to determine whether it survives. Under the traditional federal common law rule, the Estate believes that its ADA claim survives because the statute is remedial in nature and not penal.[2] Alternatively, and also with respect to its ACRA claim, the Estate disagrees with Griffin that Ark. Code Ann. § 16-62-101(a) is the relevant state statute to determine the survivability of its claims. Instead, it asks the Court to look to Arkansas' Probate Code, Ark. Code Ann. § 28-49-104, under which the Estate believes its claims survive. Again alternatively, the Estate argues that even if Ark. Code Ann. § 16-62-101(a) does apply to its ADA and ACRA claims, the claims survive.

The Motion now being ripe for adjudication, the Court finds that Arkansas' survival statute applies to the ADA as the federal rule of decision, and that the statute abates that claim. Having dismissed the only claim involving a federal question, the Court declines to exercise its supplemental jurisdiction over the Estate's ACRA claim, and dismisses that claim without prejudice. Finally, the Court finds that Griffin's Motion to Compel Discovery (Doc. 22) is moot.

## II. LEGAL STANDARD

To survive Griffin's Motion to Dismiss,[3] the Estate's Complaint must present "a short and plain statement of the claim that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The intention of this is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)

---

[2] In accordance with this distinction, the Estate concedes that it cannot recover punitive damages under the ADA.

[3] Since Griffin's Motion to Dismiss was filed after its Answer, the Court will treat it as a motion brought under Fed. R. Civ. P. 12(c). The distinction between a motion made under Fed. R. Civ. P. 12(c) and one made under Fed. R. Civ. P. 12(b)(6) "is purely formal, because we review this 12(c) motion under the standard that governs 12(b)(6) motions." *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In evaluating the sufficiency of the Complaint, the Court assumes that "all factual allegations in the pleadings are true and interpret[s] them in the light most favorable to the nonmoving party." *Bell v. Pfizer, Inc.*, 716 F.3d 1087, 1091 (8th Cir. 2013) (internal quotation omitted).

Even so, the Complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). In short, "the pleading standard that Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). When considering a motion to dismiss, the Court ordinarily does not consider matters outside the pleadings, Fed. R. Civ. P. 12(d), but may consider exhibits attached to the complaint and documents that are necessarily embraced by the pleadings. *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003).

## III. DISCUSSION

### A. The Estate's ADA Claim: Arkansas State Law Informs the Content of Federal Common Law

Griffin's Motion to Dismiss asks the Court to dismiss the Estate's ADA claim because the claim does not survive Guenther's death. Since the ADA includes no survival statute, and there is no general federal survival statute, Griffin argues that the Court should apply Arkansas' survival statute, either directly or as the federal rule of decision. The Estate disagrees. It counters that the Court should apply the traditional federal common law maxim that claims that are not penal in nature survive the death of the aggrieved party, while those that are penal in nature do not. Under this rule, most of the Estate's claims would survive Guenther's passing.

While courts outside of the Eighth Circuit have held that the survival of an ADA claim is dependent on the content of state law, *see Nordwall v. PHC-LAS Cruces, Inc.*, 906 F. Supp. 2d 1200 (D.N.M. 2013); *Hutchinson v. Spink*, 126 F.3d 895 (7th Cir. 1997); *Allred v. Solaray, Inc.*, 971 F. Supp. 1394 (D. Utah 1997); *Rosenblum v. Colo. Dept. of Health*, 878 F. Supp. 1404 (D. Colo. 1994), the district courts within this Circuit that have addressed the issue have all applied the traditional federal common law rule. *See A.H. v. St. Louis County, Mo.*, 2015 WL 4426234 (E.D. Mo. July 17, 2015); *Estate of Stoick ex rel. Spry v. McCorvey*, 2011 WL 3419939 (D. Minn. July 29, 2011); *Kettner v. Compass Grp. USA, Inc.*, 570 F. Supp. 2d 1121 (D. Minn. 2008); *Hanson v. Atl. Research Corp.*, 2003 WL 430484 (E.D. Ark. Feb. 14, 2003). The Eighth Circuit has yet to address the question, leaving this Court without binding authority directly on point. For the reasons discussed below, the Court disagrees with its sister courts in the Eighth

Circuit, and finds that Arkansas state law informs the content of federal common law on this issue.

Courts reaching this conclusion—or concluding that state law applies directly—have done so in two different ways. The first set of courts, including *Allred* and *Rosenblum*, have applied 42 U.S.C. § 1988(a) to the ADA. Section 1988(a) reads:

> The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of titles 13, 24, and 70 of the Revised Statutes . . . shall be exercised and enforced in conformity with the laws of the United States . . . but in all cases where they are . . . deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, *as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held*, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause . . . .

(emphasis added). The Court rejects the notion that § 1988(a) applies to the ADA. By its terms, § 1988(a) applies only to "titles 13, 24, and 70 of the Revised Statutes . . . ." *Id.* The Revised Statutes of the United States is the precursor to the United States Code, which was first adopted in 1926. *See* Andrew Winston, *The Revised Statutes of the United States: Predecessor to the U.S. Code*, Library of Congress (July 2, 2015), http://blogs.loc.gov/law/2015/07/the-revised-statutes-of-the-united-states-predecessor-to-the-u-s-code.

> Title 13 of the Revised Statutes consisted of R.S. §§ 530 to 1093. Likewise, Title 24 consisted of R.S. §§ 1977 to 1991, which are classified to sections 1981 to 1983, 1985 to 1987, and 1989 to 1994 of what is now Title 42 of the U.S. Code. And Title 70 of the Revised Statutes consisted of R.S. §§ 5323 to 5550, the federal criminal code at the time, which is now codified as Title 18.

*Kettner*, 570 F. Supp. 2d at 1127-28 (quotations and citations omitted). "None of the above-referenced sections of the Revised Statutes corresponds to statutes codifying . . .

the ADA . . . ." *Id.* at 1128. Instead, § 1988(a) "applies only to the Reconstruction civil rights acts, not to the employment discrimination acts of the 1960s and beyond." *Id.* (citing Brian Owsley, "Survivorship Claims Under Employment Discrimination Statutes," 69 *Miss. L.J.* 423, 428 (1999)) (quotation omitted).

Given that the plain language of § 1988(a) expressly confines its application, the Court does not believe that it should be extended to reach the ADA. This does not, however, mean that the traditional federal common law rule suggested by the Estate applies. *See Nordwall*, 906 F. Supp. 2d at 1237 (finding that § 1988(a) does not apply to the ADA, but still applying the state survival statute). Some history is useful to explain how the Court reaches this conclusion.

From the time pre-dating our nation's Civil War through its Depression Era, federal courts hearing diversity cases that did not involve a state statute routinely created rules of federal general common law. *See Swift v. Tyson*, 10 L. Ed. 865 (1842) (interpreting the Judiciary Act of 1789 to command application of state law in diversity cases only where a state statute is at issue). This practice ended with *Erie v. Thompkins*, 304 U.S. 64 (1938). Writing for the Court, Justice Brandeis explained that the *Swift* doctrine had prevented, rather than promoted, uniformity of the law. *Id.* at 75. As state judges were reluctant to surrender to federal judges their power to impose their oft-competing views of common law in their own court systems, the outcomes of common-law cases routinely turned on whether they were brought in federal or state court. *Id.* at 74-77. This led to the "mischievous result" of forum shopping between the federal and state courts, undermining the *Swift* doctrine entirely. *Id.* at 74. Justice

Brandies thus famously declared that "[t]here is no federal general common law." *Id.* at 78.

But there is still federal common law, though it is no longer general. It survives in pockets of law involving important federal interests, and in the interstices of federal statutes. *E.g.*, *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988) ("But we have held that a few areas, involving uniquely federal interests are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced, where necessary, by federal law of a content prescribed (absent explicit statutory directive) by the courts—so-called 'federal common law.'") (internal citation and quotation omitted); *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 336 (1981) ("This Court also has applied federal common law where federally created substantive rights and obligations are at stake. Thus, the Court has been called upon to pronounce common law that will fill the interstices of a pervasively federal framework . . . ."). This case being of the latter variety, the question facing this Court is not whether federal common law applies—it most certainly does—but what the content of that common law is.

The leading Supreme Court case on the matter is *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90 (1991). The plaintiff in *Kamen* brought a derivative action against Kemper Financial Services under the Investment Company Act of 1940 ("ICA"), a federal statute. *Id.* at 93-94. Under the applicable state law, the plaintiff would normally have been required to make a demand upon Kemper Financial's Board of Directors prior to bringing the derivative action. In certain circumstances, however, state law excused the demand requirement on the ground that demand would be futile. The

plaintiff filed suit without making a demand, arguing that it was excused under the state's futility exception. The district court disagreed, and dismissed the case because the plaintiff failed to plead the facts excusing demand with sufficient particularity. *Id.* at 94. The Seventh Circuit affirmed. In doing so, it went a step further than the district court and "concluded that the futility exception does little more than generate wasteful threshold litigation collateral to the merits of a derivative shareholder's claim." *Id.* Following that reasoning, the circuit court fashioned a federal common law rule, abolishing the futility exception for all derivative actions brought under federal securities laws. *Id.* at 94-95.

The Supreme Court reversed. It first determined the demand doctrine to be a matter of "substance" and not "procedure," then accordingly proceeded to "identify the source and content of the substantive law that defines the demand requirement" in a derivative action based on the ICA. *Id.* at 96-97. As Justice Marshall, writing for the unanimous Court, explained:

> It is clear that the contours of the demand requirement in a derivative action founded on the ICA are governed by *federal* law. Because the ICA is a federal statute, any common law rule necessary to effectuate a private cause of action under that statute is necessarily federal in character.
>
> It does not follow, however, that the content of such a rule must be wholly the product of a federal court's own devising. Our cases indicate that a court should endeavor to fill the interstices of federal remedial schemes with uniform federal rules only when the scheme in question evidences a distinct need for nationwide legal standards, or when express provisions in analogous statutory schemes embody congressional policy choices readily applicable to the matter at hand. *Otherwise, we have indicated that federal courts should incorporate state law as the federal rule of decision* unless application of the particular state law in question would frustrate specific objectives of the federal programs.

*Id.* at 97-98 (emphasis added) (quotations, citations, and alterations omitted).

The district courts in the Eighth Circuit that have applied the traditional federal common law rule to the ADA did not recognize *Kamen's* direct applicability to the issue. Those courts, after correctly concluding that § 1988(a) did not apply to the ADA, did not address the subsequent question of whether the content of the federal common law came from "a federal court's own devising" or from the state. *Kamen*, 500 U.S. at 98. Instead, after rejecting § 1988(a)'s applicability and determining that the *source* of the law was federal, they assumed that the *content* of the law must also be so. *E.g.*, *Spry*, 2011 WL 3419939 at *3; *Kettner*, 570 F. Supp. at 1132-33. *Kamen*, however, rejects that approach, and instructs that "federal courts should incorporate state law as the federal rule of decision" unless one of the above-quoted exceptions applies. 500 U.S. at 98 (alteration omitted).

The Court will, accordingly, apply Arkansas state law to determine the survivability of a cause of action under the ADA unless "the scheme in question evidences a distinct need for nationwide legal standards," "express provisions in analogous statutory schemes embody congressional policy choices readily applicable to the matter at hand," or "application of the particular state law in question would frustrate specific objectives of the federal programs." *Id.* at 98.

First, the Court does not find that the ADA evinces a distinct need for a national uniform rule of survivability. There are, of course, certain uniformity interests implicit in all federal laws. However, the question that *Kamen* instructs this Court to ask is whether there is a *distinct* need for uniformity. *Accord United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728 (1979) ("[F]ederal programs that by their nature are and must be uniform in character throughout the Nation necessitate formulation of controlling federal rules.

Conversely, when there is little need for a nationally uniform body of law, state law may be incorporated as the federal rule of decision.") (quotations and citations omitted). Such a need arises most clearly when the underlying lawsuit involves constitutional rights, the federal government, or officers thereof. Thus, in *Carlson v. Green*, the Supreme Court declined to apply Indiana's survival statute to a *Bivens* action. 446 U.S. 14 (1980). It did so both because the plaintiff was seeking to vindicate a federal constitutional right, and because the suit was against federal officers. *Id.* at 23-24. This created a distinct need for a uniform rule because the "liability of federal agents for violation[s] of constitutional rights should not depend upon where the violation occurred." *Id.* at 24 (adopting the Seventh Circuit's reasoning). Decades earlier in *Clearfield Trust Co. v. United States*, the Supreme Court declined to apply state law as the source of federal common law in a case involving the "rights and duties of the United States on commercial paper which it issues . . . ." 318 U.S. 363, 366 (1943). It found a distinct need for a "uniform rule" because the application of state law "would subject the rights and duties of the United States to exceptional uncertainty." *Id.* at 367.

These uniformity interests are not present in the instant case. The Estate is not seeking to vindicate a federal constitutional right, and the suit does not involve the rights and duties of the United States or its officers. Holding otherwise would, in effect, allow the exception identified in *Kamen* to swallow the rule. That is, if this case evinces a *distinct* need for a national uniform rule, then virtually any statute creating a federal cause of action would as well, and state law would hardly ever "fill the interstices of federal remedial schemes." *Kamen*, 500 U.S. at 98.

Second, the Court cannot identify any "express provisions in analogous statutory schemes" that would counsel towards crafting a uniform federal common law rule. *Id.*; *see also Boyle*, 487 U.S. at 511-12 (crafting a federal common law rule prohibiting certain state tort suits against federal military equipment contractors because the Federal Tort Claims Act would have barred an analogous suit if brought directly against the government). On the contrary, if anything, Congress has enacted an analogous statutory scheme that counsels *against* doing so: namely, the aforementioned 42 U.S.C. § 1988(a), in which Congress instructs the federal courts to apply the common law of the states to several civil rights statutes.

Finally, the Court has no basis on which to conclude that "application of the particular state law in question would frustrate specific objectives of the federal programs." *Kamen*, 500 U.S. at 98. Simply put, there is no federal "program" at issue in this case. *See e.g., Kimbell Foods*, 440 U.S. at 729 (finding that "incorporating state law to determine the rights of the United States as against private creditors would in no way hinder administration of the SBA and FHA *loan programs*" because SBA operations were "specifically and in great detail adapted to state law") (emphasis added); *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 709 (2006) (Breyer, J., dissenting) (arguing that federal common law applies in a case related to a federal employee health insurance program due to the strong uniformity interest in interpreting the program such that employees nationwide are treated equally).

In sum, the source of the law to be applied to determine the survivability of a cause of action brought under the ADA is federal. But, the content of that law is supplied by the state in which the federal court sits. This conclusion holds even though 42 U.S.C.

§ 1988(a) pointedly does not apply to the ADA. The Supreme Court has clearly instructed the federal courts to fill the interstices of federal statutes with state law, unless certain exceptions, not germane to this case, apply.

### B. Application of Arkansas State Law to the Estate's ADA Claim

#### 1. Arkansas' Tort Survival Statute Applies

As a threshold matter, the parties dispute whether Arkansas' Tort Survival Statute, Ark. Code Ann. § 16-62-101(a), applies to the Estate's ADA claim. Section 16-62-101(a) reads in pertinent part:

> **(1)** For wrongs done to the person or property of another, an action may be maintained against a wrongdoer, and the action may be brought by the person injured or, after his or her death, by his or her executor or administrator against the wrongdoer or, after the death of the wrongdoer, against the executor or administrator of the wrongdoer, in the same manner and with like effect in all respects as actions founded on contracts.
>
> **(2)** Nothing in subdivision (a)(1) of this section shall be so construed as to extend its provisions to actions of slander or libel.

Though explained somewhat cryptically in its Response Brief, the Court understands the Estate's argument to be as follows: Section 16-62-101(a) applies only to tort actions, but the instant action is more akin to breach of contract. And, while the survival of a tort action is dependent upon the passage of a state law circumventing the traditional common law rule that it does not survive, the Arkansas Supreme Court has held that breach of contract actions survive *de facto*. As support, the Estate relies on *McDonald v. Pettus*, 337 Ark. 265 (1999). In *McDonald*, the personal representatives of an estate sued an attorney for his alleged failure to properly assign certain promissory notes owned by a decedent to the deceased's children. *Id.* at 269. The suit involved both a tort claim and a breach of contract claim. The Arkansas Supreme Court held that

the tort claim was barred by Ark. Code Ann. § 16-62-101(a), but that the breach of contract claim survived because "a breach-of-contract action continues to exist beyond the decedent's death under common law, and does not depend upon the survival statute for its continued existence." *Id.* at 278.[4]

The pertinent question, then, is whether the Estate's ADA claim sounds more in tort or in breach of contract. The Court has little difficulty in concluding that it sounds more in tort. In *Gaona v. Town & Country Credit*, 324 F.3d 1050 (8th Cir. 2003), the court was tasked with determining whether Minnesota's statute of limitations for personal injury cases applied to the plaintiff's ADA claim. Noting that the Supreme Court had previously held that "§ 1983 claims are best characterized as tort claims for personal injury," *id.* at 1055 (citing *Wilson v. Garcia*, 471 U.S. 261, 276-80 (1985)), the Eighth Circuit joined "most Courts of Appeal" by applying "the state statute of limitations for personal injury actions to claims under the . . . ADA." *Id.* (listing cases).

Furthermore, even the Estate concedes that "courts frequently liken the remedies for discrimination claims to personal injury claims, and then apply statutes directed at personal injury claims in the discrimination context." (Doc. 16, p. 9). The Estate also notes that "as in a pure tort action" it "has requested damages including . . . compensatory damages for loss of income, loss of benefits, and damages for emotional distress and anxiety." *Id.* For these reasons, the Court finds that Ark. Code Ann. § 16-62-101(a) determines whether the Estate's ADA claim survives Guenther's passing.

---

[4] The case does not stand for the proposition apparently suggested by the Estate, however, that Arkansas' probate code can somehow be construed as an affirmative declaration that certain claims survive death. *See* Doc. 16, pp. 7-8. On the contrary, *McDonald* makes clear that the probate code allows the personal representative of an estate to bring a cause of action only if it otherwise survives death, either by virtue of the common law or a survival statute. *See* 337 Ark. at 279.

**2. The Estate's ADA Claim Does Not Survive Under Arkansas' Survival Statute**

Arkansas' survival statute permits "wrongs done to the person or property of another" to survive death. Ark. Code Ann. § 16-62-101(a). "In applying state law, we are bound to apply the law of the state as articulated by the state's highest court." *Travelers Prop. Cas. Ins. Co. of Am. v. Nat'l Union Ins. Co. of Pittsburg, Pa.*, 621 F.3d 697, 707 (8th Cir. 2010). The Court accordingly looks to the Arkansas Supreme Court to determine the meaning of its state's survival statute.

Beginning in *Ward v. Blackwood*, the Arkansas Supreme Court has interpreted the opening clause of the statute ("wrongs done to the person or property of another") somewhat narrowly. 41 Ark. 295 (1883). The *Ward* Court held that a lower court had erred by permitting an action for malicious prosecution to survive. "The language of the statute includes every action, the substantial character of which is bodily injury, or damage of a physical character, but does not extend to torts which do not directly affect the person, but only the feelings or reputation, such as malicious prosecution." *Id.* at 298. Three decades later the Arkansas Supreme Court revisited the issue and discussed it at some length:

> The statute means injuries of a physical character to actual, visible, and tangible property, and not to property rights or interests which in their nature are invisible and intangible. For example, if one injures another in his reputation or business by libel and slander, these, by the express terms of the statute, do not survive. And the statute by analogy has generally been construed not to include injuries or wrongs of a kindred nature, such as malicious prosecution, conspiracies to injure another's business and interests in property, to cheat, defraud, etc., where no visible personal property as such is affected. To illustrate further, where there is an injury by trespass to tangible personal property, same being damaged or destroyed, or where same is converted, or where, through negligence, the visible personal property of another is injured or destroyed, in all such cases the causes of action for damages resulting from such wrongs or injuries survive, and are assignable. But injuries that are not of a physical

> nature, and that do not operate upon or affect tangible personal property, as distinguished from property rights or interests, do not survive, and are not assignable.

*Arkansas Life Ins. Co. v. Am. Nat. Life Ins. Co.*, 110 Ark. 130, 138-39 (1913) (citations omitted). More recently, in *Cannady v. St. Vincent Infirmary Medical Center*, the Arkansas Supreme Court referenced both *Ward* and *Arkansas Life* in affirming that a cause of action for invasion of privacy does not survive a claimant's death. 2012 Ark. 369, at *8 (2012).

As a threshold matter, the Court must determine whether applicability of the survival statute should be measured by the causes of action alleged, or the injuries alleged to be underlying those actions. Though lacking a direct pronouncement on the issue, both *Ward* and *Arkansas Life* emphasize the character of the injury alleged when delineating between surviving and abated claims. *See Ward*, 41 Ark. at 298 (stating that the "statute includes every action, *the substantial character of which is bodily injury* . . . ."); *Arkansas Life*, 110 Ark. at 138 ("The statute means *injuries* of a physical character . . . ."). The Court will, accordingly, look to the injuries alleged by the Estate to determine whether its claims survive.

The Estate alleges three categorical injuries: (i) loss of employment compensation; (ii) loss of reputation and self-esteem; and (iii) mental anguish and emotional distress. (Doc. 1, p. 8). The Court has little difficulty in concluding that the second and third injuries do not survive Guenther's death. These are exactly the sort of injuries which "do not directly affect the person, but only the feelings or reputation," 41 Ark. at 298, and "which in their nature are invisible and intangible." 110 Ark. at 138. The Estate's suggestion to the contrary—that mental anguish and emotional distress

constitute physical injuries to the person—is unpersuasive. Aside from the rather obvious distinction between physical and mental injuries drawn by the cases above, the Arkansas Supreme Court has long delineated between the two in the context of negligence liability. *See Erwin v. Milligan*, 188 Ark. 658, 663 (1934) ("The rule is well established that there can be no recovery for fright or mental pain and anguish caused by negligence, where there is no physical injury."); *Dowty v. Riggs*, 2010 Ark. 465, at *6-*8 (2010) (holding that Arkansas does not recognize the tort of negligent infliction of emotional distress because the state does not permit damages based on mental suffering unaccompanied by physical injury).

Loss of employment compensation presents a much closer question. The modern cases on this topic from other courts are largely inapposite, as they involve the application of federal common law, or materially distinguishable state survival statutes. *E.g.*, *Kettner*, 570 F. Supp. 2d at 1121 (applying federal common law to determine whether Age Discrimination in Employment Act ("ADEA") and ADA claims survived); *Spiker v. Farmers Co-op. Exch. of Jet*, 802 P.2d 650, 652 (Okla. Civ. App. 1990) (applying Oklahoma's broader survival statute to determine that retaliatory discharge action survived because there was "an injury to personal property"); *Ricca v. United Press Intern., Inc.*, 1982 WL 31022 (S.D.N.Y. June 8, 1982) (applying federal common law to determine whether an ADEA claim survived death); *Hamilton v. Rogers*, 573 F. Supp. 452 (S.D. Tex. 1983) (interpreting Texas's much broader survival statute to allow a Title VII employment claim to survive). However, a detailed review of two Arkansas Supreme Court decisions from the turn of the twentieth century brings clarity to this issue.

The first case is *Arkansas Life*, 110 Ark. at 130. The plaintiff in the matter was an insurance company that had recently entered into an agreement to purchase the assets and business of a mutual fund company. The plaintiff accused the defendant, an apparent competitor, with conspiring to damage the mutual fund by, most pertinently, persuading the mutual fund's employees to breach their contracts of employment and go to work for the defendant. Because the torts underlying the conspiracy were not "of a physical character" and "did not injure the [mutual company's] tangible property," *id.* at 139, the court found that they did not survive the mutual fund's "death."[5] Importantly, this holding suggests that the Arkansas Supreme Court did not consider interference with an employment contract to be an "injury of a physical character" to "actual, visible, and tangible property," of the sort that would survive death. *Id.* at 138; *accord Parkerson v. Carrouth*, 782 F.2d 1449, 1450-53 (8th Cir. 1986) (affirming district court's ruling that Arkansas' survival statute abated claims including intentional injury to business).

The *Arkansas Life* Court's narrow understanding of the term "property" is consistent with an earlier Arkansas Supreme Court case interpreting the survival statute. *Davis v. Nichols* concerned an executor seeking to recover damages for loss of service resulting from her husband's death. 54 Ark. 358 (1891). The person who allegedly wrongfully killed her husband passed away while the suit was pending. In addressing whether the executor's suit for loss of service survived, the court said of Arkansas' survival statute:

> The injury to the person mentioned in [the survival statute] has been construed to mean a bodily injury or damage of a physical character, and

[5] The plaintiff also accused the defendant of interfering with the contracts of the plaintiff's own employees. The court addressed this claim later in the opinion and dismissed it for insufficient pleading. *Id.* at 139.

> no other, and the injury to property, *so far as it relates to personal property, is such only as was contemplated by the statute of 4 Edw. III., c. 7*, on the same subject.

*Id.* (emphasis added) (citations omitted). Looking to 4 Edw. III., c. 7, an English statute passed in 1330 which is relevant only because the *Davis* court applied it to supply meaning to an Arkansas statute, it provides:

> [W]hereas in times past, executors have not had actions for a trespass done to their testators, *as of the goods and chattels* of the same testators carried away in their life, and so such trespasses have hitherto remained unpunished; it is enacted, that the executors in such cases shall have an action against the trespassers, and recover their damages in like manner as they, whose executors they be, should have had if they were in life.

4 Edw. III., c. 7 (Eng.) (emphasis added). The *Davis* Court also distinguished Arkansas' survival statute from a "broader" survival statute from New York that used the term "property rights or interests" rather than just "property." 54 Ark. at 881-82.

Based on the above, the Court finds that the Estate's ADA claim with respect to Guenther's loss of employment did not survive his passing. While Guenther may have had a property right or interest in his employment, and the benefits thereof, such an interest is not "property" as the Arkansas Supreme Court has interpreted the survival statute to mean it. It is not "actual, visible, and tangible property." 110 Ark. at 138. It is not "goods and chattels." 4 Edw. III., c. 7 (Eng.).

### C. The Estate's ACRA Claim

Having dismissed the Estate's only claim involving a federal question—its ADA claim—the Court now declines to exercise its supplemental jurisdiction over the Estate's ACRA claim. A federal district court can exercise supplemental jurisdiction over "all other claims that are so related to claims in the action within [its] original jurisdiction that they form part of the same case or controversy under Article III of the United States

Constitution." 28 U.S.C. § 1367(a). A district court may, however, decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

In declining to exercise its supplemental jurisdiction, the Court makes no finding as to whether Arkansas' survival statute abates the Estate's ACRA claim. Accordingly, this Memorandum Opinion and the Order accompanying it should not be interpreted as having any preclusive effect on the Estate's ability to bring its ACRA claim in state court.

### D. Griffin's Motion to Compel Discovery

As the Court has granted Griffin's Motion to Dismiss the Estate's ADA claim, and declined to exercise supplemental jurisdiction over its ACRA claim, the case has been dismissed in its entirety. Griffin's Motion to Compel Discovery is therefore moot.

## IV. Conclusion

For the reasons set forth above, the Court will enter a separate Order today summarizing and effectuating the rulings described herein.

**IT IS SO ORDERED** on this 12th day of February, 2016.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE